**In re Richard C. SCARLATA, Debtor.**

**GOLDBERG SECURITIES, INC., Plaintiff,**

v.

**Richard C. SCARLATA, Defendant.**

Bankruptcy No. 88 B 2568.
Adv. No. 88 A 457.

United States Bankruptcy Court,
N.D. Illinois, E.D.

March 30, 1990.

---

Michael H. Moirano, Nisen & Elliott, Chicago, Ill., for plaintiff.

Jay A. Canel, Peter M. King, Chicago, Ill., for debtor-defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This action came on for trial before the Court and the issues having been duly tried, the parties rested and final argument was heard. The Court hereby makes and enters the following Findings of Fact and Conclusions of Law: [1]

### FINDINGS OF FACT

#### Introduction

1. The Debtor–Defendant Richard C. Scarlata ("Scarlata") filed his Chapter 7 bankruptcy proceeding on March 7, 1988.

2. This adversary proceeding was filed on June 13, 1988 by Goldberg Securities, Inc. ("Goldberg") seeking to bar dischargeability of debt.

3. Goldberg was a clearing member of the Chicago Board of Options Exchange ("CBOE") at all times mentioned in these Findings. As such, Goldberg was engaged in the business of clearing member accounts and clearing stock and index options transactions made in and through such accounts at the CBOE.

4. On December 12, 1983, JR Enterprises (Richard Scarlata nominee), entered into an account agreement with Goldberg pursuant to the terms of which Goldberg agreed to clear transactions in accounts owned by JR Enterprises.

5. JR Enterprises was a partnership comprised of John Bisoulis and Richard Scarlata.

6. One of the accounts opened by JR Enterprises was an account known as Box 3700. This account was traded exclusively by Scarlata and cleared by Goldberg from December, 1983 up through and including October 19, 1987.

7. During the term of JR Enterprises account agreement with Goldberg, with Scarlata's knowledge Goldberg acted as guarantor of Scarlata's personal account, and as such Goldberg was responsible to the Options Clearing Corporation for any debts incurred by Scarlata which Scarlata could not cover.

8. Pursuant to the JR Enterprises account agreement with Goldberg and as a trader in the index options markets at the CBOE, Scarlata cleared his accounts through Goldberg during the period 1984 through 1987, including October 19, 1987, the principal date in issue. His account with Goldberg was liquidated shortly after that date.

9. Following final liquidation of his accounts with Goldberg in 1987, Scarlata owed Goldberg $4,769,091.87. This adversary proceeding was brought to bar dischargeability of that debt under 11 U.S.C. § 523(a)(2)(A) in Count I and 11 U.S.C. § 523(a)(6) in Count II.

#### Scarlata's Background and Relationship with Goldberg

10. Scarlata started his career as a professional trader following his graduation from college in 1975, with financial resources provided by his family. He continued with his education and received his M.B.A. from the University of Chicago in 1977. While at the University of Chicago he held two internships; one of which was with Becker Securities. At Becker Securities he worked as a runner on the floor of the CBOE in the spring of 1976. After he received his M.B.A. he worked for Bankers Trust in New York City as an apprentice trader in their money market division. A few months later he returned to Chicago and applied for membership at the CBOE in April/May 1978. Before he began trading on the floor of the CBOE he opened an options trading account at Paine Webber. He became licensed as a broker/dealer with the Securities Exchange Commission, and purchased his CBOE membership for $66,000 in July, 1978.

11. (a) Prior to trading, Scarlata took courses, attended classes and was tested

1. An explanatory glossary of terms is appended and made a part of these Findings.

with respect to the capital relationships between the Options Clearing Corp. ("OCC"), the clearing firm and the market maker (trader). As he knew, the clearing firm is required to submit a letter of guarantee to the OCC for traders who carry and clear their options trading account with that firm. Scarlata understood that the OCC accumulated all trades made on a daily basis at the CBOE, that it matched up those trades and provided each clearing firm with accountings of money required to be paid to or collected from the OCC with respect to that trading and the positions taken in the market by traders clearing through each of the respective member firms. He further understood that the clearing firms provided a dual function with respect to traders: an account function whereby they would document their traders' daily trading activity; and the guarantee function, whereby the clearing firm guarantees the trades of all traders clearing their trades through that particular clearing firm. The clearing company does not share in a trader's profit, even though it guarantees his loss. Therefore the trader's representations of trading strategy plans are of critical importance to the clearing company.

(b) Scarlata also knew that a letter of guarantee was given by his clearing firm to the OCC whereby the clearing firm assumed full financial responsibility for trades executed by Scarlata to the extent that he did not have sufficient capital to cover his own capital needs. He also knew if he carried a position in the market overnight that had a "haircut requirement" (an obligation to have funds in his account, more fully explained in Finding No. 26) greater than his account equity balance, then before he could trade again he would need to arrange with his clearing firm's risk manager as to how he intended to deal with that position.

(c) All the foregoing ultimately became part of the agreement and relationship of Scarlata and Goldberg.

12. Scarlata sold his first membership after only a few months. Thereafter he held jobs where he performed a variety of clearing duties and learned various trading strategies. In 1978 he resumed his career as a professional options trader and leased a membership through First Options Corp. ("First Options").

13. In August of 1981 Scarlata's trading activity resulted in a deficit in the amount of $25,000. First Options gave Scarlata an opportunity to pay off the debit by becoming a firm trader. That is, he received a percentage of the profits from trading with funds belonging to First Options. However, in November 1982 Scarlata incurred another deficit through option trading. He became indebted to First Options in the amount of $425,000, which First Options then paid to the OCC pursuant to its letter of guarantee. Notwithstanding his acknowledgement of that debt, Scarlata never repaid any money to First Options in spite of his income in excess of $100,000 in each of the next four years.

14. With funds raised from the sale of his home, Scarlata arranged to resume his professional trading career through Goldberg in 1983. On December 12, 1983, JR Enterprises (Richard Scarlata nominee), entered into an account agreement with Goldberg and opened the account known as Box 3700.

15. The Box 3700 account was traded exclusively by Scarlata, and it was carried and cleared by Goldberg from December, 1983, up through and including October, 1987. During this period, Scarlata traded almost exclusively in the CBOE S & P 100 stock index option known as the "OEX" options.

16. Scarlata traded through Goldberg without problems of significance from December, 1983 until October 19, 1987. Whenever there was a problem with his account he took care of it. He knew when he had to deposit more funds into his account or liquidate or otherwise deal with his positions in the market. Goldberg provided him with an office and other services. Scarlata's relationship with Goldberg was based upon mutual understanding and trust from day to day.

17. Scarlata's pre-October trading activity in 1987 is best summarized by him in his November 15, 1987 letter to Goldberg where he states, "After a poor start in 1987, I went back to the basics of spreading and scalping to earn over $75,000 in August and nearly $100,000 in September." Basically he went from a year-to-date loss of $2,000 at the end of July to a year-to-date profit of $130,000 at the beginning of October, 1987.

### Events During October, 1987

18. During the week prior to October 19, 1987, however, the Dow Jones Industrial Average ("DJIA") declined substantially, leading to a severe decline in the value of the OEX stock index. The DJIA declined 108 points on Friday, October 16, 1987. As a result, during that week, Scarlata sustained heavy trading losses in his account at Goldberg. Those losses wiped out a substantial portion of trading gains he had realized earlier that year. By the close of trading on Friday, October 16, 1987, Scarlata had as assets only $22,000.00 in net equity in his trading account at Goldberg, approximately $3,500.00 in cash accounts, and various items of personal property having nominal value. In addition, Scarlata had a substantial open short put position in the OEX index, which he knew would further erode the equity in his account if the DJIA continued its decline.

19. On the morning of October 19, 1987, Scarlata did not have sufficient net equity in his account to continue trading under rules established by the Securities and Exchange Commission ("SEC"), and also established by Goldberg pursuant to their agreement. In order to continue trading, Scarlata knew he would have to increase substantially his net equity by making a significant cash deposit and also by reducing the size of his open position in the OEX index.

20. Scarlata did not wait to be confronted about his situation. In the early morning prior to commencement of trading on October 19, 1987, in order to induce Goldberg to allow him to continue trading, he went in to see and presented to Goldberg's risk manager a check in the amount of $30,000.00 to be applied to his account. Under those circumstances, that check represented an assurance of adequate liquidity in his account to the extent required by his agreement with Goldberg. He thereby impliedly represented that he possessed assets to cover the check. He also then expressly represented to the risk manager that he intended to reduce or otherwise neutralize his outstanding OEX position that day. Goldberg through its risk manager reasonably relied on the check and on the said representation. This is an industry in which verbal commitments of the same sort are commonly relied on. Scarlata's checks and commitments to Goldberg before this had always been reliable. Had he kept his word that day, he would have lost up to $200,000 in liquidating his position from the prior Friday, but not the far larger amount he did lose as set forth hereinbelow.

21. At the time Scarlata presented his check for $30,000.00 he did not have sufficient funds in his checking account to cover the amount of the check, nor did he even have sufficient assets to cover that check. In fact, on October 20, 1987 (the day after Scarlata sustained trading losses which ultimately liquidated out at a loss of $4,769,-091.87 on his account), he borrowed approximately $29,500.00 on his various personal credit cards and credit lines that he had established, and deposited this amount in his checking account to cover the check for $30,000.00 he had written to Goldberg the previous day.

22. Moreover, Scarlata's statement that he had intended to reduce or neutralize the size of his existing position in the OEX stock index was false at the time it was made and he then knew it was false. Prior to making that promise, Scarlata had over the prior weekend already formulated a plan to increase substantially the size of his existing OEX position in order to take advantage of what he perceived to be a substantial opportunity in the active market. He saw an opportunity to make large personal profits, perhaps millions of dollars, in that market.

23. Goldberg relied upon Scarlata's actions in purporting to deposit additional funds in his account and his representations that he would reduce or neutralize his existing position, in allowing Scarlata to go on the floor and into the OEX option pit to continue to trade on October 19, 1987. Had Goldberg known that Scarlata owned no additional personal funds with which to trade, or that he intended to increase substantially rather than decrease or neutralize his existing position, it would have not have allowed him to trade freely that day. Goldberg and the industry in general do not yet have available hand-held computer technology to record trades on the floor so as to enable close monitoring of all traders during the trading day. Such technology is anticipated for use in other markets and may become available. However, such was not available on Black Monday.

24. Prior to the opening of trading on October 19, 1987 Scarlata knew, from reports that were coming in from other markets around the world, that the DJIA would open significantly lower. Scarlata also knew that, due to his short position in OEX puts, any decline in the market would reduce the equity in his account to a level where, under rules established by Goldberg, he would be precluded from adding additional positions. Scarlata further knew that he would have to keep his promise to reduce sharply or otherwise neutralize his existing positions in order to minimize losses which would exceed the equity in his account.

25. The DJIA did begin a steep decline from the opening and continued to decline throughout the day. Scarlata began to sustain losses on his existing position from the moment the market opened and he continued to sustain increasing losses on this position as the market continued to decline. Despite the fact that Scarlata was sustaining these increasing losses and did not have sufficient equity in his account or other assets to support any increase in the size of his position, he nevertheless substantially increased the size of his OEX position. Specifically, Scarlata began trading on October 19, 1987, with an existing short OEX put position of 84 contracts.

Within the first hour and one-half of trading that morning, he increased the size of his short OEX put position from 84 contracts to over 800 contracts. As the trading day continued and the stock market continued to decline, Scarlata continued to increase the size of his short put position, hoping and expecting that the market would rebound and thus offset and reverse the mounting losses in his account. The market did rebound slightly during the day, thus giving Scarlata some temporary expectation that this trading strategy would work. However, Scarlata knew that he had no assets with which to satisfy additional trading losses and that the real risk of loss on the increased market position he took on October 19, 1987 was that of Goldberg.

26. Moreover, as his position increased and the market moved against him Scarlata knew that his growing "haircut requirement" could not be met by him. The testimony of Goldberg's expert Sheldon Matenberg made that clear:

[By the Court]:

"Q. Are you telling me this is what the SEC requires, what practice is, or both?
A. This is what the SEC requires.

In this case, Mr. Scarlata had a greater haircut requirement than the money in this account. The SEC also allows the clearing firm to lend him the money, the additional required funds.

And in this case, ... Mr. Scarlata's agreement with Goldberg was that they would lend him funds up to three times the amount of equity in his account.

Therefore, if he wanted to make additional trades, he would have needed additional funds, because when you trade in the pit it is more or less like writing checks, and if you don't have funds to cover these checks, it is illegal.

In this case, he didn't have any additional funds and he couldn't hope to have any additional funds because he said that the clearing firm would not lend him or it was his understanding with the clearing firm that the firm would not lend him more than two times his equity to cover

his haircut requirement. Therefore as the market started to move against him, he had an increasing haircut requirement and he didn't have funds to cover that haircut requirement; therefore, he didn't have funds to trade."

Trial Transcript pp. 95–97.

27. The OEX pit at the CBOE normally opens at 8:30 A.M. with one short opening rotation. During this opening rotation, each individual option series opens one at a time in order to achieve a uniform opening price in each of the series of an option class. Free trading does not begin until the rather brief opening rotation is concluded. On October 19, 1987, the opening rotation took much longer than usual, 1 hour and 30 minutes until about 10:00 A.M. Then the CBOE conducted a second rotation, itself a very unusual step. The second rotation began in the OEX pit at 10:02 A.M. and lasted until 11:36 A.M. Chicago time. This unusual sequence of events delayed Scarlata's efforts to trade freely, and somewhat impeded his marketing strategy. On Monday, October 19, 1987 the Dow Jones Industrial Average declined 22.6%, falling 508.32 points to close at 1,738.40. For good reason that day has become known in the trading world as "Black Monday."

28. By the close of trading on October 19, 1987, Scarlata had traded to a position whereby he was short 1035 OEX put contracts. The loss on those contracts that day, on top of the short position that Scarlata had closed with the prior Friday, ultimately was liquidated by Goldberg at a total net loss of $4,769,091.87. The full amount of the $4,769,091.87 loss was paid to the OCC by Goldberg. Scarlata owes that sum to Goldberg but has paid no part of that debt. However, of that sum the evidence does not clearly or convincingly show that Goldberg acted with complete reasonable care so as to minimize its losses. More specifically, Goldberg has not met its burden to prove that $550,000 of the loss could not have been avoided through the liquidation of "December 285" puts at more favorable prices available to it over the following two days. In this regard, the Court does not mean to suggest that

Goldberg was careless in its liquidation of the Scarlata account following Black Monday. However, the requirement of proof by clear and convincing evidence as discussed in the Conclusions of Law applies as well to proof that damages were caused by the conduct complained of. That imposed a burden on Plaintiff at trial to negate by clear and convincing evidence the possibility revealed by evidence that it might have liquidated "December 285" puts at more favorable available prices, thereby reducing its net losses by $550,000.

29. In subsequent communications with Goldberg, Scarlata admitted that his trading on October 19, 1987 was a "complete departure" from the way he had traded at Goldberg over the prior four years. At no time prior to October 19, 1987, had Scarlata taken a position in the market that approximated the size of his position on October 19, 1987. Scarlata took that position realizing that he thereby broke his commitment to the Goldberg risk manager, that he did not have the assets to support it, that his increasing position violated Goldberg's internal rules and limitations on individual trading, and that the entire risk of loss of his position would be that of Goldberg if the stock market continued to decline.

30. By increasing the size of his short OEX put position as the market continued to decline, and by failing to reduce or neutralize his existing position as he had promised and represented to do, Scarlata effectively used Goldberg's credit to conduct his trading on October 19, 1987. He wilfully put that firm at risk in a manner and to an extent that was neither authorized nor permissible under his trading privileges and agreement with Goldberg. In his effort to make a personal market killing and reap great personal profit, he threw his promise, commitment, agreement, good judgment, and honor itself to the winds as he played a game that only he could win and only Goldberg could lose since Scarlata had few assets to lose and Goldberg could not profit from any success Scarlata might have.

31. Goldberg has proved by clear and convincing evidence that the harm and

damages it suffered from reasonably relying on Scarlata's false pretense that his $30,000 check was backed by his assets, and on his misrepresentation of intent to liquidate or cover his position on Black Monday, was $4,019,091.87 ($4,769,091.87 less up to $200,000 that Scarlata would have lost had he kept his word, Finding No. 20; and less $550,000 in losses that Goldberg did not prove by clear and convincing evidence it could not have avoided, Finding No. 28).

32. Facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### Jurisdiction

1. This Court has core jurisdiction under 28 U.S.C. § 157(b)(2)(I), 11 U.S.C. § 523, and the general Order of Reference entered by the District Court.

### Count I—11 U.S.C. § 523(a)(2)(A)

2. Section 523(a)(2)(A) provides that:
(a) a discharge under Sections 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
(2) for money, property, services, or extension, renewal or refinancing of credit to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

■ 3. In order to bar Scarlata's debt from discharge under § 523(a)(2)(A), Goldberg must establish three elements by clear and convincing evidence:

(a) That on October 19, 1987 Scarlata obtained continued permission to clear his trades through Goldberg and thereby obtained credit based on Goldberg's guarantee of his trading account through false pretenses or by making representations that were either knowingly false or were made with such reckless disregard for the truth as to constitute wilful misrepresentation.

(b) That in making the false pretenses or misrepresentations Scarlata possessed an actual intent to defraud Goldberg; and

(c) That Goldberg actually and reasonably relied upon Scarlata's false representations or false pretenses.

*In re Kimzey,* 761 F.2d 421, 423 (7th Cir. 1986); *In re Iaquinta,* 98 B.R. 919, 923 (Bankr.N.D.Ill.1989).

■ 4. Goldberg has proven by clear and convincing evidence that Scarlata's check was a false pretense and that Scarlata wilfully and falsely misrepresented that he intended to reduce or neutralize his short put position in order to be permitted to trade freely:

(a) Scarlata planned between October 16, 1987 and the morning of October 19, 1987 to substantially increase the size of his short OEX position in OEX put options October 19, 1987 in order to take advantage of what he perceived to be a buying opportunity to make a large personal profit.

(b) Scarlata concealed his planned buying strategy and instead represented to Goldberg's risk managers that he would reduce his position.

(c) Scarlata was insolvent after his trading losses prior to October 19, 1987, and wrote Goldberg a $30,000.00 check on an account with insufficient funds to cover it; he had to borrow the funds the next day to cover that check. At no time prior to commencement of trading on October 19, 1987 did he advise Goldberg of his precarious financial condition. Rather, by submission of the check to meet his minimum "haircut" requirements and misrepresenting his intended trading strategy he was planning to use Goldberg's credit to bail himself out and to re-establish equity in his account. The $30,000.00 check that he gave on October 19, 1987, when he possessed no money to cover it was a classic false pretense in aid of that scheme.

(d) Prior to active trading beginning on October 19, 1987, Scarlata knew that the DJIA had declined to a level below that of October 16, 1987. Under the circumstances of his precarious financial condition, he

knew that he was prohibited by Goldberg internal trading rules from taking on any further positions. He nonetheless continued to conceal his financial condition from Goldberg, misrepresented his intent in order to be allowed on the trading floor, and proceeded to trade freely and to sell large numbers of put option contracts through the day despite of a continued steep decline in the market.

(e) Scarlata admitted to Goldberg after October 19, 1987 that his trading on October 19, 1987 was a complete departure from his previous method of trading.

■ (f) Further, considering each of the foregoing wilful misrepresentations in light of the huge losses risked and ultimately suffered by Goldberg that day as a direct and proximate result of Scarlata's trading activities, Scarlata's actual intent to defraud Goldberg can be inferred from his deceitful actions taken to get access to the trading floor that day. *See In re Williams*, 85 B.R. 494, 499 (N.D.Ill.1988); *In re Deloian*, 60 B.R. 161, 163 (Bankr.N.D.Ill.1986). Proof of such fraudulent intent may be implied under the totality of the circumstances here. *In re Niemiec*, 60 B.R. 737, 741 (Bankr.N.D.Ill.1986). However, here the proof was direct that the phony check and phony promise were given with intent to defraud Goldberg out of its rights to manage its risks prudently and to supervise those persons who clear through it.

■ 5. Goldberg would not have permitted Scarlata to trade had its risk manager known Scarlata's precarious financial circumstances and his true intentions. It actually and reasonably relied on the $30,000 check and Scarlata's promise to reduce or neutralize his outstanding short put position. *In re Kreps*, 700 F.2d 372, 276 (7th Cir.1983). Moreover, this actual reliance was reasonable because:

(a) Goldberg's customary practice was to accord sufficient trust in Scarlata's representations so as to allow him to trade freely, because of his four year prior record of responsible trading with that clearing house and based upon its own internal rules.

(b) The customary practice among CBOE clearing houses under the same general circumstances would have allowed Scarlata to trade, because it is the practice in the clearing house industry to accept representations of the traders as to their trading strategies. The industry does not yet have technology to monitor trading during the day, and therefore reasonably relies on equity in the traders' accounts and their known or represented practices which are reviewed at the close of each day and prior to opening of trading the next day.

(c) Scarlata's volunteered payment of $30,000.00 on the morning of October 19, 1987, along with his representation that he would reduce his existing short put position, satisfied Goldberg's risk manager that he could reasonably exercise his discretion to allow Scarlata to trade. Moreover, Goldberg was not then aware nor was it in a position to know the precarious nature of Scarlata's personal financial condition at the time that this approval was given, or his plan for aggressive trading. Indeed, Goldberg's prior experience with Scarlata had been favorable and his prior checks and promises had been reliable. *See Iaquinta*, 98 B.R. at 923; *In re Mitchell*, 70 B.R. 524 (Bankr.N.D.Ill.1987).

### Count II—11 U.S.C. § 523(a)(6)

6. Pursuant to 11 U.S.C. § 523(a)(6):

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for wilful and malicious injury by the debtor to another entity or to the property of another entity.

7. The issues in Count II of the Complaint are more difficult. In order for the debt owed by Scarlata to be nondischargeable under § 523(a)(6), Goldberg must prove by clear and convincing evidence that the debt resulted from Scarlata's wilful and malicious actions. *In re Bogstad*, 779 F.2d 370, 372 (7th Cir.1985) (stating generally that a party who seeks to establish an exception to discharge bears the burden of proof and the standard is one of clear and

convincing evidence); *Iaquinta,* 98 B.R. at 923 (the standard under § 523(a)(2), (4), (6) is one of "clear and convincing evidence."). *Contra Combs v. Richardson,* 838 F.2d 112, 116 (4th Cir.1988). But *see* fn. 3.

■ 8. Under § 523(a)(6), plaintiff must prove that defendant's conduct was both wilful *and* malicious. *Kimzey,* 761 F.2d at 424. The language of § 523(a)(6) is critical. To give this phrase meaning, "willful" and "malicious" must refer to the *act* resulting in injury. The nature of the injury, independent from the act causing it, cannot be the basis for making determination of when a "willful and malicious injury" has occurred. Under § 532(a)(6) the term "wilful" means deliberate or intentional. *In re Condict,* 71 B.R. 485, 487 (N.D.Ill.1987). Intent is not proven by establishing "reckless disregard." *United Bank of Southgate v. Nelson,* 35 B.R. 766, 770 (N.D.Ill.1983). "Malicious" means wrongful and without just cause or excuse, even in the absence of personal hatred or ill will. *Condict,* 71 B.R. at 487. In determining whether Scarlata's act was "malicious", only a finding of implied or constructive malicious intent is generally required. *Condict,* 71 B.R. at 487; *In re Hallahan,* 78 B.R. 547, 550 (Bankr.C.D.Ill. 1987); *In re Jones,* 88 B.R. 899 (Bankr.E.D. Wis.1988).

■ 9. In this case Debtor specifically but falsely told the Goldberg representative that he intended to reduce or neutralize the size of his existing OEX stock index position. However, he did not intentionally misrepresent his trading strategy in order to inflict loss on Goldberg. Instead, he did so in an attempt to get back on the trading floor so as to recapture his earlier losses and obtain a large personal profit. The consequence of this plan, however, was that he exposed both himself and Goldberg to the extensive losses that were incurred. To the extent he had no assets only Goldberg was thereby exposed. Indeed, if Debtor had not misrepresented his strategy, Goldberg would not have let him on the

floor to trade. Further, it is clear from the fact that he concealed his true trading strategy that he recognized the possibility that such large losses could be incurred and that Goldberg would not approve such a strategy.

10. Under this fact situation, if "willful" and "malicious" were given their common meaning then the debt should be dischargeable; Debtor was not motivated by a desire to inflict an injury on Goldberg. However, as previously discussed, "malicious" does not require ill will or viciousness. In *Condict,* for example, Judge Kocoras stated that "a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury." *Condict,* 71 B.R. at 487, *citing* 3 *Collier on Bankruptcy* ¶ 523.16 (15th ed. 1979).

11. The most comprehensive discussion of the meaning of "malicious" is found in a decision of our District Court, *United Bank of Southgate v. Nelson,* 35 B.R. 766 (N.D.Ill.1983).[2] In *Southgate* a bank held a security interest in a trailer as the assignee of an installment sales contract with Nelson, the debtor. Under the installment contract Nelson was required to maintain insurance on the trailer and in the event of an accident, to pay any insurance proceeds to the bank. The trailer was destroyed and insurance was paid to Nelson. He failed to notify the bank of either the destruction of the trailer or of the insurance payout, later asserting that he was unaware of this requirement. Nelson continued to make payments under the installment contract for approximately a year and then defaulted. Shortly thereafter he filed for bankruptcy. The bank moved to have the debt declared nondischargeable under 11 U.S.C. § 523(a)(6).

12. The bankruptcy court in *Southgate* rejected the bank's § 523(a)(6) action, holding that "malicious" required an "intent to do harm to the creditor." Following a detailed analysis of the legislative history to

---

2. As Judge Barliant recently observed, the Seventh Circuit has not yet specifically construed the meaning of "malicious" as that term is used in 11 U.S.C. § 523(a)(6). *Lopez v. Martinez,* 110 B.R. 353, 356 (Bankr.N.D.Ill.1990).

§ 523(a)(6) and the construction given to its statutory predecessor, Judge Roszkowski reversed the bankruptcy court. He held that "in the context of a debtor who sells encumbered property prior to bankruptcy, 'willful and malicious injury' means a deliberate or intentional act in which the debtor knows his act would harm the creditors interest and proceeds in the fac[e] of the knowledge." Id. at 776. Under this standard, Nelson's debt to the bank was nondischargeable even though he had no subjective intent to inflict injury. He knowingly took steps that directly harmed the secured party's interest, and that was enough.

13. The construction of "malicious" adopted in *Southgate* has been widely followed. *See, e.g., Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1262–63 (11th Cir. 1988); *In re Posta*, 866 F.2d 364, 367–68 (10th Cir.1989). Further, it has not been limited to the context of a debtor who converts property prior to bankruptcy. *In re Hopkins*, 82 B.R. 952 (Bankr.N.D.Ill. 1988), for example, specifically follows the *Southgate* standard where the debt arose because the debtor, while intoxicated and inside a lumber yard, intentionally burned a cardboard box, but the fire got out of control and burned the entire lumberyard.

14. Under the definition of "malicious" announced by the district court in *Southgate* and *Condict*, the question in the present case is whether the specific wrongful act alleged to be "malicious" was necessarily and predictably related to the harm, here Goldberg's loss in excess of $4 million, so that act may be characterized as malicious. In *Condict* the court stated that to be "malicious" the act must *"necessarily produce"* the harm. 71 B.R. at 487 (Emphasis added.) In *Southgate*, the court found malice when "the debtor knows his act *would harm* the creditors interest and proceeds in the fac[e] of the knowledge." 35 B.R. at 776 (Emphasis added.). *Cf.* 1 Robert E. Ginsberg, *Bankruptcy* § 11.06[i] at 941 (2nd ed. 1989) (stating that under the majority view "there is malice so long as the intentional conduct of the debtor caused financial injury and the conduct was taken in *reckless disregard of the prospect of the injury.*") (emphasis added).

15. The initial wrongful act by Scarlata in this case was Scarlata's misrepresentations to Goldberg about his check and the trading strategy he intended to follow on Black Monday. That wrongful conduct resulted in liability under Count I. But the question in Count II is whether Scarlata's aggressive trading, in the light of his earlier deceit, was "malicious" under § 523(a)(6). The fact that distinguishes this case from a conversion of secured property (as illustrated by *Southgate* and the cases discussed therein) is that Debtor's trading strategy, no matter how risky, did not automatically or necessarily mean that he would lose and Goldberg's property would be lost. Indeed, at the time of the misrepresentation and during most of the trading day Debtor believed that the market would turn upward and allow him to reap great profit. He did not expect that his misrepresentation used to get on the trading floor would in fact harm Goldberg and himself through large trading losses. In contrast, in the typical case where secured property is converted by a debtor, even if the debtor did not mentally intend to harm the secured party, the harm to the secured party from the wrongful act of conversion is both direct and automatic, therefore "wilful" and "malicious".

16. If Goldberg had been apprised of Debtor's true trading strategy, it would not have permitted Debtor to trade on the morning of Black Monday. This indicates that from Goldberg's perspective, at the moment of the misrepresentation, Debtor's trading strategy created an unacceptable risk of loss. Although Goldberg undertakes a substantial financial risk every trading day, it seeks to control this risk through its trading rules and risk managers. A trader such as Scarlata with inadequate assets who deceives his clearing house and breaks the trading rules therefore exposes that firm to risks it does not want to take, and in this sense "harms" it. Such risk, however, is a critical step removed from necessary or automatic financial loss. Scarlata's trading strategy, although riskier than Goldberg would have approved, did not here necessarily or auto-

matically result in financial harm to Goldberg.[3]

■■■ 17. A variation of the analysis advanced by Goldberg is that at the time of Debtor's misrepresentation he "converted" Goldberg's property because any losses he incurred would be borne by Goldberg. A "wilful and malicious injury" does indeed include a willful and malicious conversion. 3 King, *Collier on Bankruptcy* ¶ 523.16 at 523–115 (15th ed. 1989). *See generally Southgate*, 35 B.R. 766. Under Illinois law, the tort of conversion includes "an unauthorized act by which the owner or one having a right of property in the personal property is deprived of the same." *Iaquinta*, 98 B.R. at 925 (citation omitted). However, even if conversion under state law is established, this does not automatically mean an injury under § 523(a)(6) has been established. Judge Ginsberg in his treatise states:

> [I]t will not be enough to avoid the discharge of that claim in a Chapter 7 proceeding for the lender to show that the debtor is guilty of a conversion of the collateral under state law. Instead, the claim is dischargeable in a Chapter 7 proceeding unless the lender can show that the debtor acted both wilfully and maliciously in disposing of the collateral. That is an important point for lenders to keep in mind. State law conversion often does not require a showing of malice.

1 Ginsberg, *Bankruptcy* § 11.06[i] at 940.

18. Even though Debtor's misrepresentation itself did not result in a "wilful and malicious" injury to Goldberg, it is possible to argue that at some point on Black Monday Debtor was intentionally and deliberately executing option contracts with constructive malice to Goldberg's financial interest. Goldberg, of course, puts its assets at risk every day, and always relies on the trading judgment of traders such as Debtor. Accordingly, the fact that Goldberg bears the loss when one of its traders loses money certainly will not deprive such trader of bankruptcy discharge on that ground alone. However, here Debtor deliberately expanded his short position from 80 to 1024 contracts, going monumentally beyond his ability to pay unless the market recovered. As the day wore on Debtor got deeper and deeper in the hole. Goldberg argues that at some point he knew that his only hope was to use Goldberg's money to bail himself out.

19. Goldberg argues further that this case is the same as if Debtor had taken Goldberg's money to Las Vegas and gambled with it, and asserts that any loss from such an expedition would result in debt barred by § 523(a)(6). Here, Debtor did not assert physical control over Goldberg's assets. However, by trading when he knew he had insufficient assets to cover his position in event of loss, did he effectively use Goldberg's credit just the same as if he walked off with cash?

■■ 20. Although Goldberg undoubtedly assumes a risk for the trading judgment of traders who clear through it, this doesn't mean that a trader has *carte*

---

**3.** The relationship between the wrongful act and the resulting injury is illustrated by the *Hopkins* case. As discussed, in that case the debtor, while intoxicated, intentionally burned a card board box, but the fire spread and eventually destroyed the entire lumberyard. Debtor plead guilty to the charge of "criminal damage to property." The court held that the debtor was estopped by the guilty plea (and a related civil suit default judgment) from contesting the dischargeability issue under § 523(a)(6). The court then addressed debtor's argument that § 523(a)(6) was inapplicable because he did not intend to burn the entire lumberyard, only the cardboard box. In rejecting this argument, the court explained:

> An action under Section 523(a)(6) does not require a specific intent state of mind. In

other words, it need not be proven that the Debtor specifically intended to burn down the entire lumber company. Rather it only need to be proven that the Debtor was consciously aware of his conduct.

The *Hopkins'* court essentially reasoned that if a debtor intends to engage in specific destructive action (burning the box), then his action is "wilful and malicious" if the debtor should have recognized that his action would likely lead to substantial property damage to the debtor and proceeded in the face of such a risk. In other words, the debtor in *Hopkins* wilfully and maliciously performed a destructive act that resulted in larger destruction. In contrast, Scarlata's trading strategy did not equate to an intentionally destructive act.

*blanche.* If a trader who had no assets executed option contracts with the intention of inflicting loss on his clearing company, then any resulting loss would of course be a debt barred by § 523(a)(6). Debtor's situation differs in that subjective intent to harm is absent and his trading judgment is implicated in his conduct. Specifically, the problem with Goldberg's argument is that it raises this question: At what point, if ever, does trading judgment become so reckless, regardless of a subjective intent, that the risk to a clearing company is so extensive and automatic that further trades would necessarily produce a loss?

21. The facts here are indeed dramatic. Debtor knew that his trading strategy violated Goldberg's policy. He lied because otherwise he knew he wouldn't be able to trade. He then expanded his position from 80 to 1024 contracts. As described above, however, Scarlata's trading plan on the morning of Black Monday was intended to profit, not to lose. While he had no right to deceive Goldberg in order to trade that day, he did not place trades with the intent to harm Goldberg. Indeed the market might well have turned as he had predicted. For all the skills that trained students of such markets may have, market forecasts are best estimates rather than scientific predictions. Through deceit he obtained access to the pit so as to trade in a risky market, one that was not predictable.

22. This is a risk business in which Goldberg and other companies in its position try to manage their risk. In doing so the clearing company reasonably may rely and indeed must rely on the account balances and deposits thereto, and on trading strategies promised by their traders in deciding whether to allow them to trade and clear on its credit. But once on the trading floor and in the pit, all traders engage in trading that jeopardizes the credit and assets of the clearing company to some extent, sometimes to a large extent. They normally do so with intent to make profit for themselves, not with intent to lose and harm the clearing company or their own

assets and future. Risk is inherent every day, and fortunes are often made and lost within short periods. A clearing company may manage that risk out front before trading begins, but not mitigate risk by barring discharge of the trader in bankruptcy because of his risky trading judgments. To control risk during the trading day, the developing technology may indeed provide promise for the future.

23. Although the Debtor here wrongfully started to trade knowing that he was risking Goldberg's assets without its knowing consent, the prospect of loss was not sufficiently certain or automatic so as to make his conduct "malicious." The issue in Count II of the Complaint is whether Goldberg has proven by clear and convincing evidence that Scarlata's conduct was wilful and malicious in the injury of Goldberg's property once he was allowed to trade. Under the facts of this case the court does not find that burden was met.[4] Therefore, the debt owing to Plaintiff by the Debtor–Defendant is not barred from discharge under Count II.

24. The conclusion that the amount of the nondischargeable debt under § 523(a)(2)(A) is the entire $4 million (after deductions referred to in the Findings) that Goldberg eventually lost from Debtor's misrepresentation is not inconsistent with the holding under § 523(a)(6). Under § 523(a)(2)(A) the inquiry is the traditional tort inquiry of whether the subsequent losses were proximately caused by Debtor's misrepresentation. *See, e.g., In re Dougherty,* 84 B.R. 653, 656 (9th Cir. BAP 1988) (under § 523(a)(2)(A) it must be shown that "the creditor sustained the alleged loss and damage as a proximate result of the representations."). In contrast, under § 523(a)(6) the initial focus is on whether the misrepresentation should be characterized as "malicious," and this depends on whether the wrongful act is of a sort that necessarily produced the harm. This is a more stringent standard. Accord-

4. Even if Goldberg's burden was to prove a wilful and malicious injury by a preponderance of the evidence, rather than clear and convinc- ing evidence, the court finds that Goldberg failed to sustain that burden because of the reasoning of these Conclusions.

ingly, the huge trading loss Goldberg eventually incurred was sufficiently foreseeable at the time of the misrepresentation and proximately resulted from the misrepresentations so as to require that the debt be nondischargeable under § 523(a)(2)(A). However, given inherent risk and uncertainty of trading, and possibility of market up-turn that Scarlata foresaw, his trading was not sufficiently certain to cause loss so as to make the trading "malicious" within § 523(a)(6).

25. The remaining cases relied on by Goldberg involved qualitatively different risks of loss than those confronting Debtor and Goldberg, as the firm who cleared Debtor's trades. *See In re Figge*, 94 B.R. 654 (Bankr.C.D.Cal.1988) (misrepresentation made to bank was "malicious" because ability to repay the loan hinged on real estate appreciation that was too speculative and default was "the reasonably foreseeable consequence" of the scheme). *See also In re Singleton*, 37 B.R. 787 (Bankr.D.Nev. 1987) (drafting checks when debtor knew he had insufficient assets was "wilful and malicious", where such acts directly caused the loss, and did not merely open the door to the trading floor as did Scarlata's check). They are therefore not particularly instructive on the issue of whether the risk of loss to Goldberg was so certain that the injury that occurred was "malicious".

### CONCLUSION

Pursuant to the foregoing Findings and Conclusions, Plaintiff Goldberg Securities, Inc. has met its burden of showing that the actions of Debtor–Defendant Richard C. Scarlata relating to his trading in OEX put options on October 19, 1987 justify the bar of part of his debt from the debtor's general discharge, pursuant to § 523(a)(2)(A) under Count I. However, that burden has not been met under § 523(a)(6). Mr. Scarlata's debt due to Goldberg Securities, Inc. is nondischargeable to the extent of $4,019,091.87, but only under Count I. Judgment in accordance with these Findings of Fact and Conclusions of Law will be entered concurrent with this memorandum, for Plaintiff on Count I (but in a lesser amount than that prayed for) and for Debtor–Defendant on Count II.

Because of the foregoing split ruling, the Court will order pursuant to Bankruptcy Rule 7054 [ (See also F.R.Civ.P.R. 54(d) ] that neither party recover costs.

### APPENDIX

### GLOSSARY

Clearing Corporation

The term "Clearing Corporation" means The Options Clearing Corporation.

Clearing Member

The term "Clearing Member" means a member of the Exchange who has been admitted to membership in the Clearing Corporation pursuant to the provisions of the Rules of the Clearing Corporation.

Option Contract

The term "option contract" means a put or a call issued, or subject to issuance, by the Clearing Corporation pursuant to the Rules of the Clearing Corporation.

Put

The term "put" means an option contract under which the holder of the option has the right in accordance with the terms and provisions of the option, to sell to the Clearing Corporation the number of shares of the underlying security covered by the option contract.

Call

The term "call" means an option contract under which the holder of the option has the right, in accordance with the terms of the option, to purchase from the Clearing Corporation the number of shares of the underlying security covered by the option contract.

Type of Option

The term "type of option" means the classification of an option contract as either a put or a call.

Class of Options

The term "class of options" means all option contracts of the same type covering the same underlying security.

Series of Options

The term "series of options" means all option contracts of the same class having the same exercise price and expiration date.

### Exercise Price

The term "exercise price" means the specified price per unit at which the underlying security may be purchased or sold upon the exercise of an option contract.

### Long Position

The term "long position" means a person's interest as the holder of one or more units of trading of a given option contract.

### Short Position

The term "short position" means a person's interest as the writer of one or more units of trading of a given option contract.

### Covered

The term "covered" in respect of a short position in a call option contract means that the writer's obligation is secured by a "specific deposit" or an "escrow deposit" meeting the conditions of Rule 610(f) or 610(h), respectively, of the Rules of the Clearing Corporation, or the writer holds in the same account as the short position in a share-for-share basis, a long position either in the underlying security or in an option contract of the same class of options where the exercise price of the option contact in such long position is equal to or less than the exercise price of the option contract in such short position. The term "covered" in respect of a short position in a put option contract means that the writer holds in the same account as the short position, on a share-for-share basis, a long position in an option contract of the same class of options where the exercise price of the option contract in such long position is equal to or greater than the exercise price of the option contract in such short position.

### Uncovered

The term "uncovered" in respect of a short position in a option contract means that the short position is not covered.