In re Richard C. SCARLATA, Debtor.

**GOLDBERG SECURITIES, INC.,**
**Plaintiff/Appellee/Cross**
**Appellant,**

v.

**Richard C. SCARLATA,**
**Defendant/Appellant/Cross**
**Appellee.**

**No. 90 C 2933.**

United States District Court,
N.D. Illinois, E.D.

May 30, 1991.

**1006**

Donald Cahill Shine, Neisen & Elliott, Chicago, Ill., for Goldberg Securities, Inc.

Andrew B. David, William J. Gigler, Sugar, Friedberg & Felsenthal, Chicago, Ill., for Richard C. Scarlata.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

This is an appeal and cross-appeal from a bankruptcy court judgment holding that a certain debt was barred from discharge pursuant to 11 U.S.C. § 523(a)(2)(A), and that the same debt was not barred from discharge under 11 U.S.C. § 523(a)(6). *See Goldberg Securities, Inc. v. Scarlata (In re Scarlata)*, 112 B.R. 279 (Bankr.N.D.Ill. 1990). For the reasons stated herein, the judgment of the bankruptcy court is reversed with respect to Section 523(a)(2)(A)

**1.** OEX is the acronym for stock option contracts based on the Standard and Poor 100 index. *See*

but affirmed with respect to Section 523(a)(6).

## FACTS

This appeal concerns a certain debt owed by debtor-defendant Richard Scarlata ("Scarlata") to Goldberg Securities, Inc. ("Goldberg") resulting from Scarlata's trading activities on the Chicago Board of Options Exchange ("CBOE") in October 1987. In October 1987, Scarlata was a market-maker specialist trading for his own account on the floor of the CBOE. Scarlata was trading almost exclusively in the stock index option known as the "OEX" option.[1] Goldberg is a clearing member of the CBOE engaged in the business of clearing member accounts and transactions made through accounts at the CBOE. In addition to clearing the accounts of market-makers, clearing firms must also guarantee the trades of all traders clearing though that particular clearing firm to the Options Clearing Corporation ("OCC"). Scarlata began clearing his account through Goldberg in December, 1983, and continued until October 19, 1987. Thus, Goldberg was required to assume full financial responsibility for any trade that Scarlata lacked the financial means to cover during this period.

Scarlata cleared his account through Goldberg without major problems until the end of October 1987. During the week prior to October 16, 1987, the Dow Jones Industrial Average (the "Dow") declined dramatically. On Friday, October 16, 1987, the Dow dropped 108 points. As a result, Scarlata suffered heavy trading losses in his account with Goldberg. By the close of trading on Friday, October 16, 1987, Scarlata had assets of $22,000 of net equity in his trading account at Goldberg, approximately $3,500 in cash accounts and items of personalty of nominal value. *Scarlata*, 112 B.R. at 284. In addition, at the end of trading on Friday, October 16, 1987, Scarlata had a substantial open short OEX put position of 84 contracts which he knew

Scarlata's Brief at 6 n. 2.

would continue to erode equity in his trading account if the market continued its decline.[2] According to Scarlata's testimony at trial, he wanted to be in short puts because he hoped and expected that the market would open higher on Monday, October 19, 1987. Trial Tr. 2–2–90, pp. 135–36.

Clearing firms generally review the accounts of market-makers to scrutinize the amount of net equity in the respective trading accounts relative to the positions of a particular trader. Trial Tr. 1–29–90, pp. 112–118. Consistent with industry standards, Scarlata understood that Goldberg required a ratio of two-to-one or three-to-one of equity relative to positions. *Id.* at 117. On Monday, October 19, 1987, Scarlata did not have enough equity in his trading account to continue trading under rules established by the Securities Exchange Commission ("SEC") and Goldberg's internal rules.

Thus, on the morning of Monday, October 19, 1987, Scarlata knew that he was likely to be on Goldberg's list of troubled accounts. Trial Tr. 1–31–90, pp. 165, 167. In order to be allowed to trade, Scarlata knew he would be required to increase the equity in his account by making a cash deposit or by reducing the size of his open short put position in OEX contracts. Early in the morning and prior to commencement of trading on Monday, October 19, 1987, Scarlata went into the conference room where Goldberg's risk managers were reviewing trader accounts and gave Goldberg's senior risk manager a check in the amount of $30,000. In addition, Scarlata expressly represented to the risk manager that he intended to reduce his positions. Trial Tr. 2–1–90, pp. 57–61.

At the time Scarlata presented the check for $30,000, he had neither sufficient funds in his checking account nor sufficient assets to cover the check. Scarlata testified that he intended to go to the bank during his break on Monday and deposit money to cover the check. Trial Tr. 2–1–90, p. 159; 2–2–90, pp. 20–21. Scarlata further testified that he arranged with his bank to cover the check, which created an overdraft in his checking account. Trial Tr. 2–1–90, p. 21–22. The next day, October 20, 1987, Scarlata borrowed approximately $29,500 from various credit cards for the purpose of covering the check. The check was honored by Scarlata's bank.

Prior to the opening of trading, Scarlata received reports from oversees markets which indicated that the market would open lower on Monday, October 19, 1987. Trial Tr. 2–1–90, pp. 62–63. The Dow did, in fact, begin steep decline from the opening. Scarlata began to sustain losses in his trading account as a result of his open short put position. Although Scarlata was sustaining losses and did not have the equity in his account to increase his position further, he began to increase the size of his short put position. Apparently, Scarlata hoped and expected that the market would rebound and thus offset the losses in his account. Although the market rebounded slightly, it eventually closed down 508.32 points. By the end of trading on Monday, October 19, 1987, Scarlata had increased his position to the point where he was short 1035 OEX put option contracts. The loss was eventually liquidated at $4,769,091.87.[3] Goldberg was required to and did pay the full amount to the OCC.

Scarlata filed his Chapter 7 bankruptcy proceeding on March 7, 1988. Goldberg brought an adversary proceeding on June

---

2. In layman's terms, a put option is an option to sell a stock (or in the case of OEX index options a "basket" of stocks) at a specified price (called the "strike" or "exercise" price) by a certain time in the future. The buyer of the option, who pays a premium, has the right to sell the stock back to the seller by the date on which the option expires. The term "short position" usually refers a person's position as the writer or seller of the option.

3. The bankruptcy court held that Goldberg did not meet its burden of proving that $550,000 of the loss could not be avoided through liquidation at more favorable prices. Thus, the court held that the total amount of damages was $4,019,091.87 (4,769,091.87 less up to $200,000 that Scarlata would have lost "had he kept his word" and less the $550,000 in losses noted above). *Scarlata,* 112 B.R. at 286–87, ¶ 31. Apparently, Goldberg does not contest the bankruptcy court's ruling as to the $550,000.

13, 1988 seeking to bar dischargeability of the debt under Sections 523(a)(2)(A) and (a)(6). The issues presented on appeal are: (1) whether the bankruptcy court erred in finding that Goldberg met its burden to bar dischargeability of the debt under Section 523(a)(2)(A), (2) whether the bankruptcy court erred by allowing Goldberg's expert witness to hear Scarlata's testimony, (3) whether the bankruptcy court erred by allowing Goldberg to file amended proposed findings of fact and conclusions of law and (4) whether the bankruptcy court erred by refusing to allow testimony as to trading losses sustained by third parties on October 19, 1987. The issue on Goldberg's cross-appeal is whether the bankruptcy court erred by finding that Scarlata's actions did not constitute wilful and malicious injury pursuant to Section 523(a)(6).

## DISCUSSION

 When a district court reviews a decision of the bankruptcy court, the bankruptcy court's conclusions of law are reviewed *de novo*. *In re Excalibur Automobile Corp.*, 859 F.2d 454, 457 n. 3 (7th Cir.1988). The district court, however, is required to accept the bankruptcy court's findings of fact unless they are clearly erroneous. *See* Bankruptcy Rule 8013 (West 1987); *see also In re Excalibur Automobile Corp.*, 859 F.2d 454, 457 n. 3 (7th Cir.1988); *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985). Moreover, the party seeking reversal of the bankruptcy court's findings must show that the findings were clearly erroneous, and not merely that the bankruptcy court could have reached another decision. *First Bank of Whiting v. Kham & Nate's Shoes No. 2, Inc.*, 104 B.R. 909, 910 (N.D.Ill.1989) citing *In re Soucek*, 50 B.R. 753, 755 (N.D.Ill.1985).[4] The district court may "disturb the findings of the bankruptcy court only if it is 'left with the

definite and firm conviction that a mistake has been committed.'" *Id.* citing *Matter of Muller*, 851 F.2d 916, 920 (7th Cir.1988).

### I. Scarlata's Appeal

#### A. Count I—11 U.S.C. § 523(a)(2)(A)

In order to bar dischargeability of the debt under Section 523(a)(2)(A),[5] Goldberg was required to establish three elements by clear and convincing evidence: (1) that on October 19, 1987, Scarlata obtained continued permission to trade and Goldberg's continued guarantee of his trades through false pretenses or by making representations that were either knowingly false or were made with reckless disregard for the truth as to constitute wilful misrepresentation; (2) that in making the false pretenses and/or false representations, Scarlata possessed an actual intent to defraud Goldberg; and (3) that Goldberg actually and reasonably relied on the false pretenses or false representations. *Scarlata*, 112 B.R. at 287, citing *In re Kimzey*, 761 F.2d at 423; *In re Iaquinta*, 98 B.R. 919, 923 (Bankr.N.D.Ill.1989).

The bankruptcy court found that Goldberg proved by clear and convincing evidence that Scarlata's $30,000 check was a false pretense and that Scarlata "wilfully and falsely misrepresented that he intended to reduce or neutralize his short put position in order to be permitted to trade freely." *Scarlata*, 112 B.R. at 287. In its factual findings, the bankruptcy court found that Scarlata's statement that he would reduce or neutralize his position was "false at the time it was made and he then knew it was false." *Id.* at 284, ¶ 22. The court found the statement false because it affirmatively found that "[p]rior to making that promise, Scarlata had over the prior weekend already formulated a plan to increase substantially the size of his existing

---

**4.** *First Bank of Whiting* was later vacated and remanded on other grounds. *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir.1990).

**5.** Section 523(a)(2)(A) provides that:
(a) a discharge under Section 727, 1141, 1228(a), 1228(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or extension, renewal or refinancing of credit to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

OEX position in order to take advantage of what he perceived to be an substantial opportunity in the active market." *Id.*[6] Thus, the court found that since Scarlata had already formulated a plan to increase his position, his representation early Monday morning was knowingly false.

■ Although Scarlata contends that the bankruptcy court erred because it found the $30,000 check to be a false representation, he misreads the bankruptcy court's opinion. Contrary to Scarlata's contention, the bankruptcy court held that the check was a "false pretense." *See Scarlata*, 112 B.R. at 287, ¶¶ 31, 4(a). A false pretense involves an implied misrepresentation or conduct that is intended to create and foster a false impression, while a false representation involves an express representation. *See In re Guy*, 101 B.R. 961, 978 (Bankr.N.D.Ind.1988).

Nevertheless, Scarlata correctly points out the Section 523(a)(2)(A) does not apply to false pretenses, false representations or actual fraud respecting the debtor's own financial condition. He contends that the bankruptcy court erred as a matter of law and fact when it concluded that the $30,000 check amounted to an express or implied representation regarding Scarlata's own financial condition. Scarlata bases this contention on the bankruptcy court's finding that the $30,000 check "represented an assurance of adequate liquidity in his account to the extent required by his agreement with Goldberg" and that "[h]e thereby *impliedly represented* that he possessed assets to cover the check." *Scarlata*, 112 B.R. at 284, ¶ 20 (emphasis added).

■ Whether issuing a check drawn on insufficient funds contains an implied representation that there are funds in the account to cover the check has been the subject of much debate. *See Microtech Int'l Inc. v. Horwitz (In re Horwitz)*, 100 B.R.

395, 398 (Bankr.N.D.Ill.1989) (discussing split of authority). However, in *Williams v. U.S.*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), the United States Supreme Court held that a person could not be convicted under 18 U.S.C. § 1014, dealing with making false statements to federal financial institutions for engaging in a scheme amounting to "check kiting." The court concluded that depositing checks drawn on insufficient funds did not involve making a false statement because "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false'." *Id.* at 284, 102 S.Ct. at 3091. The court further noted that the checks served only to direct the drawee-payor bank to pay the amount to the bearer while obligating the drawer to pay the amount if dishonored by the drawee-payor bank. *Id.*

In *Horwitz*, the court considered the split of authority and concluded that although the Supreme Court in *Williams* was construing a criminal statute and thus applying the "rule of lenity," a similar rule applied in construing the exceptions to dischargeability under Section 523(a)(2)(A) because exceptions to discharge must be strictly construed in favor of the debtor. *Horwitz*, 100 B.R. at 398 citing *In re Cross*, 666 F.2d 873, 879–80 (5th Cir.1982); *Mullally v. Carter*, 67 B.R. 535, 536 (N.D. Ill.1986). Furthermore, the *Horwitz* court noted that cases holding that a check drawn on insufficient funds contains an implied representation of adequate funds in the account fail to address or even cite the Supreme Court decision in *Williams*. This court agrees with the court's reasoning in *Horwitz* and therefore concludes that a check drawn on insufficient funds, without more, does not constitute an implied representation that there are funds on account to cover the check sufficient to bar discharge under Section 523(a)(2)(A).[7]

---

**6.** In the conclusions of law, the bankruptcy court reiterated that Scarlata had, over the previous weekend, developed a plan to increase his position. *See Scarlata*, 112 B.R. at 287, ¶ 4(a) ("Scarlata had planned between October 16, 1987 and the morning of October 19, 1987 to

substantially increase the size of his short OEX position in OEX put options ....").

**7.** In the case at bar, there is no evidence that Scarlata made any additional oral representations regarding the check when he gave it to Goldberg's risk manager. *See Horwitz*, 100 B.R.

Although Goldberg fails to contest this conclusion, it argues that Scarlata's check was a false pretense because it lulled Goldberg's risk manager into letting Scarlata trade on Monday, October 19, 1987. Nevertheless, in its argument, Goldberg implicitly admits that any misrepresentation relating to the check related to Scarlata's own financial condition. For example, Goldberg states that it was "Scarlata's brash use of the $30,000 check to create the *false impression of substantial net worth* " that was deceitful. *See* Goldberg's Response Memo. at 17 (emphasis added). Furthermore, Goldberg states that "there is no question Scarlata intended his check to give Goldberg the false impression that he had *the financial wherewithal and integrity* to continue unrestricted trading." *Id.* at 18 (emphasis added). Although both Goldberg and the bankruptcy court refer to the check as "phoney," it is undisputed that the check was never dishonored by Scarlata's bank. Moreover, as any implied misrepresentation stemming from the check related to Scarlata's own financial condition, the bankruptcy court erred by resting its finding of non-dischargeability on the alleged false pretense that Scarlata impliedly represented that he had sufficient assets to cover the check.

■■■ The bankruptcy court also held that the debt was barred from discharge under Section 523(a)(2)(A) because it found that Scarlata misrepresented his intent to reduce or neutralize his position. To be actionable, the alleged fraud must have existed at the time the debt was incurred. Furthermore, false representations or false statements "encompass statements that falsely purport to depict *current or past facts* and do not relate to *future action.*" *In re Guy*, 101 B.R. at 979, citing *In re Todd*, 34 B.R. 633, 635 (Bankr.W.D.Ky. 1983) (emphasis in original). When the alleged representation involves a promise to do something in the future, subsequent conduct contrary to a former representation does not necessarily render the repre-

sentation false. *See In re Guy*, 101 B.R. at 978.

■■■ In the case at bar, the bankruptcy court found that Goldberg had sustained its burden of showing by clear and convincing evidence that Scarlata's oral statement was knowingly false when made. As noted above, the court found Scarlata's statement false because it affirmatively found that he had formulated a plan over the weekend to increase substantially the size of his short OEX position. *Scarlata*, 112 B.R. at 284, ¶ 22; p. 287, ¶ 4a).

The Court concludes that the bankruptcy court's finding that Scarlata statement was knowingly false when made and thus that he misrepresented his intended trading strategy is not supported by the record and thus is clearly erroneous. There is no evidence in the record to support the court's conclusion that Scarlata had formulated a plan over the preceding weekend to increase substantially his short OEX position. Rather, the record contains Scarlata's uncontradicted testimony that he intended to reduce or neutralize his positions when he made the statement to Goldberg's risk manager. *See* Trial Tr. 1–31–90, pp. 153–54; 2–1–90, pp. 58, 61, 63.

Scarlata testified that he went home on Friday with a short put position because he expected the market to open higher on Monday. Further, he testified that it was approximately one hour after he made the statement to the risk manager that he received news from overseas markets indicating that instead of opening higher as Scarlata had expected, it would likely open lower. After the market opened down Scarlata, like any losing gambler, continued trading hoping his luck would change and the market would reverse its trend. Thus, Scarlata continued to increase the size of his position hoping and expecting that the market would rebound and reverse the losses in his account. Trial Tr. 2–1–90, p. 107. Scarlata testified that when the market did briefly rally, he attempted to buy-in his positions. He further testified that his

at 399 (court noted that in second action before it, complaint alleged that drawer of non-sufficient funds check made oral representations

that a check already returned would be honored and that a second check was backed by sufficient funds).

attempt to reduce his positions was hampered by an "unprecedented" halt in trading and difficulties obtaining all the puts he needed to buy. Trial Tr. 2-1-90, pp. 116-30, 165-66.

Although not directly commented on by the bankruptcy judge, the only evidence of a plan relied upon by Goldberg is a conversation Scarlata on Sunday October 18, 1987 with a Mr. Asher ("Asher"). Asher, who owned his own clearing firm, discussed the market situation with Scarlata. Scarlata testified that he told Asher that he thought that the market would open up on Monday, and that he wanted to be in short puts on Friday. Trial Tr. 1-31-90, pp. 135-37. Although Scarlata testified that he told Asher he thought the market presented a buying opportunity, he specifically testified that he thought the buying opportunity passed with the close on Friday. *Id.* at 149-51. There was no testimony that Scarlata told Asher that he planned to increase his position.

Goldberg did not seek to impeach Scarlata's testimony on this issue, and it did not offer any other evidence of a plan. Further, the bankruptcy court did not state that it rejected Scarlata's testimony as not credible. Although the court notes that a trial court is entitled to disregard testimony that is not believed and that such credibility determinations are to be accorded significant deference, "[n]ormally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984) citing *Moore v. Chesapeake & Ohio R. Co.,* 340 U.S. 573, 575-76, 71 S.Ct. 428, 429-30, 95 L.Ed. 547 (1951).

To support its view that the trial judge found Scarlata to be a "liar," Goldberg points to testimony by Fred Quinn ("Quinn"), its senior risk manager, that allegedly contradicts Scarlata's testimony. *See* Goldberg's Reply Brief at 2-4. Specifically, Goldberg relies on Quinn's testimony that Scarlata presented the check and made the oral representation between 7:00 a.m. and 8:00 a.m., not at approximately 6:00

a.m. as Scarlata testified. Thus, Goldberg argues that the trial judge correctly chose to disregard Scarlata's testimony relating to the morning of October 19, 1987, including his testimony that the oral representation was true when made, because the court found his testimony not credible.

First, the Court notes that Quinn specifically testified that "he did not know exactly what time" Scarlata came in, but that he "believe[d] it was between 7:00 a.m. and 8:00 a.m. in the morning." Trial Tr. 2-2-90, p. 40. Thus, although Goldberg would believe otherwise, the testimony is far from a definitive statement. Second, the testimony offered by Goldberg does not in any way relate to the bankruptcy court's finding that Scarlata had formulated a plan over the weekend to take action contrary to his representation. Third, even assuming that the court did find Scarlata's testimony to be not credible, it is not a sufficient basis, in the absence of any other evidence, to draw the contrary conclusion that Scarlata had formulated a plan over the weekend which rendered his oral representation false when made.

Therefore, there is no evidence in the record to support the bankruptcy court's finding that Scarlata had formulated a plan over the weekend to substantially increase the size of his short put position. Moreover, the record discloses Scarlata's uncontradicted testimony that his statement that he intended to reduce or neutralize his positions was true when it was made. Accordingly, there is no evidence to support the court's finding that Scarlata knowingly misrepresented his intended trading strategy and the judgment of the bankruptcy court that the debt was barred from discharge pursuant to Section 523(a)(2)(A) is reversed. As the court has concluded that Goldberg did not establish by clear and convincing evidence that Scarlata's statement amounted to a misrepresentation, the court need not address the remaining elements of intent and reasonable reliance.

B. Scarlata's Other Contentions on Appeal

■ Scarlata argues that the bankruptcy judge committed reversible error (1) by al-

lowing Goldberg's expert witness to listen to Scarlata's testimony after witnesses had been excluded pursuant to Federal Rule of Evidence 615 ("Rule 615"), (2) by allowing Goldberg to file amended proposed findings of fact and conclusions of law and (3) by refusing to allow introduction of evidence regarding trading losses of third parties on October 19, 1987. The court concludes that Scarlata's contentions are without merit.

Although Rule 615 provides that a court *shall* exclude witnesses upon request by a party, it does not completely limit the court's discretion. Rule 615 provides for an exception in the case of a "person whose presence is shown by a party to be essential to presentation of the case." Moreover, in *Morvant v. Construction Aggregates Corp.*, 570 F.2d 626, 629–30 (6th Cir. 1978) the court concluded that:

> where a party seeks to except an expert witness from exclusion under Rule 615 on the basis that he needs to hear firsthand the testimony of the witness, the decision whether to permit him to remain is within the discretion of the trial judge and should not normally be disturbed on appeal

In *Morvant*, the court noted that the purpose of the sequestration rule is to prevent the shaping of testimony and to discourage fabrication, inaccuracy and collusion. However, when applying the rationale to expert witnesses, the court concluded that there is "little, if any, reason for sequestering a witness who is to testify in an expert capacity only and not to the facts of the case." *Id.* at 629. Further, Rule 703 of the Federal Rules of Evidence provides that an expert may base an expert opinion or inference on facts perceived or made known to the expert "*at* or before the hearing." In the instant case, the trial judge found that it was not prejudicial for the expert to sit in to listen firsthand to testimony that directly bore on his own testimony. The expert was not an occurrence witness and there was no fear that

he would match his testimony to what he heard. The court therefore concludes that the bankruptcy court did not abuse its discretion.

■ Next, Scarlata contends that he was prejudiced when the court allowed Goldberg to file amended proposed findings of fact and conclusions of law adding the conclusion that Goldberg reasonably relied on the Scarlata's oral statement. Although the allegation of reliance on the oral statement was omitted from Goldberg's initial proposed conclusions of law, the complaint clearly alleged reliance on the oral representation. Moreover, the oral representation was found in paragraph 9 of Goldberg's initial proposed findings of fact. *See also* Goldberg's initial proposed findings of fact and conclusions of law at ¶ 12. Therefore, the bankruptcy court properly concluded that the allegation of reliance was always in the case, and Scarlata was not prejudiced by the amendment. Trial Tr. 1–31–90, pp. 8–9.

■ Finally, the court concludes that the bankruptcy court did not err by refusing to admit testimony regarding trading losses suffered by third parties on October 19, 1987. The determination of relevance and admissibility of evidence lies within the sound discretion of the trial court. In the case at bar, the court cannot conclude that the trial court clearly abused its discretion in holding the evidence not relevant. Accordingly, Scarlata's contention is without merit.

## II. Goldberg's Cross–Appeal

■ Goldberg cross appeals from the judgment of the bankruptcy court that the debt was not barred from discharge under Section 523(a)(6).[8] Pursuant to Section 523(a)(6), plaintiff must prove by clear and convincing evidence that defendant's conduct was both wilful *and* malicious. *Scarlata*, 112 B.R. at 289; *In re Kimzey*,

---

**8.** Section 523(a)(6) provides:
(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

761 F.2d at 424. "Wilful" means deliberate or intentional. *Scarlata,* 112 B.R. at 289, citing *In re Condict,* 71 B.R. at 487. "Malicious" means wrongful and without just cause, even in the absence of personal hatred or ill will. *Id.* The term "wilful and malicious" does not mean reckless disregard or mere negligence. *Scarlata,* 112 B.R. at 289; *see also In re Guy,* 101 B.R. at 981 and cases cited therein. Moreover, even gross negligence is not sufficient to show wilful and malicious injury. *In re Guy,* 101 B.R. at 981, citing *In re Louis,* 49 B.R. 135, 137 (Bankr.E.D.Wis.1985).

■ The bankruptcy court found that Scarlata's actions were not malicious as the term is used in Section 523(a)(6). Courts are split over the correct interpretation of the term "malicious." Some courts have interpreted the phrase to mean an intentional act resulting in injury, while others have required an intent to cause harm. *See In re Guy,* 101 B.R. at 981 (citing cases). Although the bankruptcy court noted that the Seventh Circuit has not yet construed the term "malicious" as used in Section 523(a)(6), it relied on leading cases from this district.

After an exhaustive analysis of the legislative history of Section 523(a)(6) and its statutory predecessor, the court in *United Bank of Southgate v. Nelson,* 35 B.R. 766, 776 (N.D.Ill.1983), concluded that in the context of a debtor who sells encumbered property prior to bankruptcy, wilful and malicious injury means "a deliberate or intentional act in which the debtor knows his act would harm the creditors interest and proceeds in the fact of the knowledge." In adopting this definition, the court rejected the "intent to harm" standard. Similarly, in *In re Condict,* 71 B.R. 485, 487 (N.D.Ill. 1987), the court stated that "a wrongful act done intentionally, *which necessarily produces harm* and is without just cause or excuse" may constitute wilful and malicious injury. (emphasis added).

The bankruptcy court therefore concluded that "[u]nder the definition of ·'mali-

cious' announced by the district court in *Southgate* and *Condict,* the question in the present case is whether the specific wrongful act alleged to be 'malicious' was *necessarily and predictably related to the harm." Scarlata,* 112 B.R. at 290. (emphasis added). Although Goldberg would focus on the court's quotation from Ginsberg's treatise on bankruptcy, the court clearly based its interpretation on the district court opinions.

■ To the extent that the bankruptcy court's analysis in Count II rested on its finding that Goldberg had met its burden of showing by clear and convincing evidence that Scarlata engaged in misrepresentations regarding the check and the oral statement, we must disagree. *See* discussion *supra* Part I. However, assuming that clear and convincing evidence showed that Scarlata was guilty of making such misrepresentations, the Court concludes that the bankruptcy court applied the correct interpretation of the term "malicious." Contrary to Goldberg's assertions, the bankruptcy court did not base its ruling on the fact that Scarlata did not have the subjective intent to harm Goldberg. Rather, the court correctly focused on whether the harm was "necessarily and predictably related" to the allegedly malicious acts. *Scarlata* 112 B.R. at 290. Taking into account the unpredictable nature of the market, the court concluded that the prospect of loss was not sufficiently certain to constitute "malicious" injury. The Court agrees with the reasoning of the bankruptcy court and adopts it as if set forth herein. Accordingly, the bankruptcy court's finding that Goldberg did not prove by clear and convincing evidence[9] that Scarlata's conduct was "wilful and malicious" is affirmed.

## CONCLUSION

For the foregoing reasons, the judgment of the bankruptcy court that the debt was barred from discharge under Section 523(a)(2)(A) is reversed, while the judgment

---

**9.** The bankruptcy court concluded that Goldberg would have failed to satisfy its burden even if it were required to prove "wilful and

malicious" injury by a preponderance of the evidence. *Scarlata,* 112 B.R. at 292 n. 4.

that the debt was not barred from discharge under Section 523(a)(6) is affirmed.

IT IS SO ORDERED.