In re Peter H. DAWES, Debtor.

P & S X–RAY COMPANY, INC., Plaintiff,

v.

Peter H. DAWES, Defendant.

Bankruptcy No. 94 B 17143.
Adv. No. 94 A 01869.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Nov. 30, 1995.

Kevin T. Keating, Mark E. Shure, Keating & Shure, Ltd., Chicago, IL, Roderick K. Nelson, Lamar, Nelson & Miller, P.C., Birmingham, AL, for P & S X-Ray Company, Inc., Plaintiff.

Richard S. Lauter, McBride, Baker & Coles, Chicago, IL, Leonard A. Nelson, Schoenberg, Fisher & Newman, Ltd., Chicago, IL, for Peter H. Dawes, Debtor/Defendant.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This adversary proceeding comes before the Court on the second amended complaint filed by P & S X–Ray Company, Inc. ("PSX") against Peter H. Dawes (the "Debtor") pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6) to determine the dischargeability of a debt owed to PSX by the Debtor. For the reasons set forth below, the Court hereby holds that the debt is dischargeable pursuant to §§ 523(a)(2)(A) and (a)(6) and enters judgment in favor of the Debtor.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334(b) and Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## II. FACTS AND BACKGROUND

Many of the relevant facts and background were previously set forth in a Memorandum Opinion written by the Court pertaining to a motion for partial summary judgment filed by PSX. See P & S X–Ray Co., Inc. v. Dawes (In re Dawes), 1995 WL 461880 (Bankr.N.D.Ill. July 24, 1995).[1] The background facts set forth in that Opinion are hereby incorporated by reference and need not be repeated. The Debtor and Leroy W. Bailey ("Bailey") were both officers and directors of U.S. Imaging, Inc. ("USI"). USI purchased radiographic or x-ray products at wholesale and then sold them at a profit to retailers. USI operated from Carol Stream, Illinois, and it was primarily managed by the Debtor. The Debtor was assisted by Suzanne C. Nagy, whose primary responsibility included the bookkeeping for USI.

Bailey lived in Ohio and was primarily concerned with the operations of Professional X–Ray, Inc., an Illinois corporation ("PXI"). The Debtor and Bailey were also officers and directors of PXI. In contrast to USI's wholesale business over a number of states, PXI sold x-ray equipment on a retail basis only in Ohio. PXI, in addition to acting as one of USI's retail dealers, provided certain services to USI, including the installation and servicing of x-ray equipment for USI's customers. PXI also provided employees to USI.

The largest supplier for USI was Shimadzu Medical Systems, a division of Shimadzu Precision Instruments, Inc. ("Shimadzu"). Shimadzu imported x-ray systems into the United States. Shimadzu then resold equipment which was used for medical purposes to wholesalers such as USI.

On March 28, 1988, Shimadzu and USI signed a wholesale distributorship agreement (the "wholesale agreement"). See Defendant's Exhibit No. 1 and Plaintiff's Exhibit No. 40. Article I of the wholesale agreement appointed USI to serve as a non-exclusive distributor for Shimadzu in twelve states, including Alabama. Id. Under Article XIX, the initial term of the wholesale agreement was to remain in effect through December 31, 1990. Id. It contained additional terms concerning extension or termination of the wholesale agreement. Id. Apparently, USI's sole source of equipment was Shimadzu because the Debtor testified that Shimadzu was "the only game in town" as General Electric did not use wholesalers.

PSX is an Alabama corporation with its principal place of business in Birmingham, Alabama. On November 2, 1988, PSX and USI entered into an agreement whereby PSX became a nonexclusive retail dealer for USI in Alabama for the sale of radiographic products. See Plaintiff's Exhibit No. 57 (the "retail agreement"). The ordinary course of dealings between USI and PSX, as reflected in the purchase orders, required PSX to forward a twenty percent down payment to USI with each written order placed with USI, the balance being due before shipment of the equipment by Shimadzu. Neither the

---

1. PSX sought summary judgment on Counts I and III of the complaint based on the doctrine of collateral estoppel. PSX argued that the judgment, which was awarded by an arbitrator, was based on findings of fraud and willful and malicious conduct by the Debtor. Based on the record provided to the Court, the Court was unable to apply the doctrine of collateral estoppel, and thus denied the motion.

wholesale agreement with Shimadzu nor USI's retail agreement with PSX required a down payment with an order. USI was not required under its retail agreement with PSX to segregate the down payments it received. The testimony at trial was unrebutted that, after it received down payments, USI would deposit same in its general corporate bank account.

The Debtor testified that from the commencement of the wholesale agreement, USI and Shimadzu had an ongoing dispute regarding USI's alleged failure to pay accounts payable owed for equipment and Shimadzu's alleged late shipments and shipment of defective equipment. Since September 1989, Shimadzu claimed USI had been delinquent in its payments. As early as February 1990, Shimadzu agreed to release new equipment to USI only if USI paid down the account claimed due to Shimadzu. *See* Plaintiff's Exhibit Nos. 1, 4, 6, and 7. As of July 12, 1990, Shimadzu claimed USI owed $3,485,180.63, of which $933,623.05 was more than 90 days past due. *See* Plaintiff's Exhibit No. 7. On August 14, 1990, counsel for Shimadzu wrote a demand letter to the Debtor and Bailey which stated, among other conditions, that Shimadzu would not ship any new orders, except parts, unless the Debtor and Bailey personally guaranteed all past and future debts to Shimadzu. *See* Plaintiff's Exhibit No. 9.[2]

Because of the ongoing problems in the relationship between Shimadzu and USI, on September 4, 1990, USI made a proposal to Shimadzu to reduce its debt.[3] As a confirming memorandum stated from S. Fukui of Shimadzu to the Debtor on September 20, 1990, USI had committed to make the following payments on orders that it had previously placed with Shimadzu, and Shimadzu agreed to make the following shipments of equipment which USI had previously ordered:

| MONTH | PAYMENT DUE | SHIPMENT ORDERED | SHIPMENT TO PAYMENT RATIO |
|---|---|---|---|
| September | $ 590,000 | $ 517,000 | 87% |
| October | $2,966,000 | $1,123,000 | 37% |
| October | $2,066,000 | $1,123,000 | 54% (excluding MRI) |
| November | $1,371,000 | $ 416,000 | 30% |
| December | $ 581,000 | $ 195,000 | 33% |

*See* Plaintiff's Exhibit No. 15 (the "September 4 payment schedule"). Shimadzu agreed that future shipments would be made in the ratio of $80,000 of equipment and parts shipped for each $100,000 in payments made by USI. *Id.* The Debtor and Nagy both testified that the September 4 payment schedule was not likely to be met because USI did not have a sufficient cash flow to service the debt. The Debtor further testified that the September 4 payment schedule was intended to be flexible and was dependent upon Shimadzu shipping equipment in a timely manner so it could collect from its customers, and thus, in turn, fund the scheduled payments to Shimadzu.

In August 1990, PSX inquired about the availability of a particular model CAT scanner x-ray unit. The Debtor, in turn, contacted Shimadzu to inquire about the availability of such CAT scanner. The Debtor testified that a representative from Shimadzu informed him that only one of that specific model CAT scanner was available in the region. Thereafter, the Debtor informed PSX that if PSX would forward a down payment to USI immediately, the one remaining CAT

**2.** Shimadzu sought additional collateral to secure the USI account. PXI had ordered certain Shimadzu equipment from USI for Hillcrest Community Hospital in Ohio. Shimadzu was refusing to ship this equipment absent a personal guaranty from the Debtor. The Debtor executed a personal guaranty in the sum of $900,000.00 to ensure the delivery of the equipment for the Hillcrest sale.

**3.** The September 4, 1990 proposal was not made a part of the record, but its terms were set forth in Shimadzu's responsive memorandum. *See* Plaintiff's Exhibit No. 15.

scanner available in the region would be designated for delivery to PSX.

On September 6, 1990, PSX placed orders for the Shimadzu equipment with USI. *See* Defendant's Exhibit No. 2. Thereafter, on September 17, 1990, PSX forwarded two deposits to USI in the amounts of $33,201.25 and $31,182.50 as down payments for dual x-ray room equipment. *See* Plaintiff Exhibit Nos. 50 and 53. On September 17, PSX placed the order with USI for the subject CAT scanner. *See* Plaintiff's Exhibit Nos. 49 and 52; Defendant's Exhibit No. 2, pp. 1 and 2; Plaintiff's Exhibit No. 51; Defendant's Exhibit No. 2, p. 3. On September 18, 1990, PSX forwarded a down payment to USI in the sum of $89,605.00. *See* Plaintiff's Exhibit No. 51. The total amount of the three down payments which PSX sent to USI was $153,988.75. Neither USI nor the Debtor returned PSX's deposits for the equipment despite its subsequent demands. Shimadzu acknowledged, in writing, all of the subject PSX equipment orders placed by USI on September 11 and 12, 1990, prior to PSX sending the down payments to USI. *See* Defendant's Exhibit No. 4, pp. 4–5. In addition, Shimadzu sent invoices to USI showing that it had shipped equipment, unrelated to the subject PSX equipment, in September 1990. *See* Defendant's Exhibit No. 5. The instant adversary proceeding revolves around these equipment orders PSX placed with USI in September 1990, and the down payments it made to USI which were not refunded.

It is undisputed that all three of PSX's down payments to USI were deposited in USI's general corporate checking account. On September 17, 1990, USI wire transferred $207,050.90 to Shimadzu for the Hillcrest equipment. *See* Defendant's Exhibit No. 3B. On September 18, 1990, USI sent a check to Shimadzu in the amount of $193,293.40. *See* Defendant's Exhibit No. 3A, p. 4. On September 27, 1990 Shimadzu wrote to the Debtor and informed him that it had

so far received in September only $400,344.30 of the $590,000.00 that USI agreed to pay per the memorandum of September 20 (Plaintiff's Exhibit No. 15). *See* Plaintiff's Exhibit No. 18. The $400,344.30 total was comprised of the wire transfer on September 17, 1990 and the check that was sent on September 18, 1990. Shimadzu demanded payment of the remaining $189,655.70 due in September. *See* Plaintiff's Exhibit No. 18. USI failed to pay the balance under its September payment schedule. On October 1, 1990, Shimadzu terminated the wholesale agreement with USI. *See* Defendant's Exhibit No. 9 and Plaintiff's Exhibit No. 20.

The instant complaint asserts that the $153,988.53 [4] claim of PSX is nondischargeable under § 523(a)(2)(A) (Count I); § 523(a)(2)(B) (Count II) [5]; and § 523(a)(6) (Count III). The Court held a trial, which concluded on October 31, 1995. After submission of post-trial papers, the matter was taken under advisement.

### III. *APPLICABLE STANDARDS*

■ The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *In re Martin,* 698 F.2d 883, 887 (7th Cir.1983). The burden of proof required for establishing an exception to discharge is a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). To further the policy of providing the debtor a fresh start in bankruptcy, exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *Meyer v. Rigdon,* 36 F.3d 1375, 1385 (7th Cir.1994); *In re Zarzynski,* 771 F.2d 304, 306 (7th Cir.1985).

Section 523 of the Bankruptcy Code enumerates specific exceptions to the dischargeability of debts. PSX alternatively contends that the debt arises from fraudulent or willful and malicious conduct of the Debtor and, as such, is nondischargeable.

---

4. On August 26, 1993, without specifically finding facts supporting a fraud or conversion committed by the Debtor, an arbitrator made a written arbitration award in this liquidated sum plus attorneys' fees and costs against both USI and the Debtor. For more information regarding the background facts in this matter, see *Dawes,* 1995 WL 461880.

5. Prior to the commencement of the trial, PSX voluntarily dismissed this count of the complaint.

**A. The Fraud Claim Under Count I**

Section 523(a)(2)(A) provides in relevant part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insiders' financial condition.

11 U.S.C. § 523(a)(2)(A).

■ In order to except fraud from dischargeability under § 523(a)(2)(A), PSX must establish the following elements: (1) the Debtor obtained the funds at issue from PSX through false pretenses or representations he either knew to be false, or made with such reckless disregard for the truth as to constitute willful misrepresentations; (2) the Debtor possessed the requisite scienter, i.e., he actually intended to deceive PSX; and (3) to its detriment, PSX justifiably relied on the misrepresentations. *See Field v. Mans,* — U.S. —, —, 116 S.Ct. 437, 443–44, 133 L.Ed.2d 351 (1995); *see also Mayer v. Spanel Int'l Ltd. (In re Mayer),* 51 F.3d 670, 673 (7th Cir.1995); *In re Sheridan,* 57 F.3d 627, 635 (7th Cir.1995); *Goldberg Securities, Inc. v. Scarlata (In re Scarlata),* 979 F.2d 521, 525 (7th Cir.1992).

■ An intent to deceive may be inferred from a false representation which the debtor knows or should know will induce another to advance money to the debtor. *First Nat'l Bank of Red Bud v. Kimzey (In re Kimzey),* 761 F.2d 421, 423–24 (7th Cir. 1985). Fraudulent intent can be established by circumstantial evidence. *Union Nat'l Bank of Marseilles v. Leigh (In re Leigh),* 165 B.R. 203, 215 (Bankr.N.D.Ill.1993); *Katahn Assoc., Inc. v. Wien (In re Wien),* 155 B.R. 479, 488 (Bankr.N.D.Ill.1993).

■ A false pretense involves an implied misrepresentation or conduct intended to create and foster an impression. *In re Scarlata,* 112 B.R. 279 (Bankr.N.D.Ill.1990), *aff'd in part, rev'd in part,* 127 B.R. 1004, 1009 (N.D.Ill.1991), *aff'd in part,* 979 F.2d 521 (7th Cir.1992); *Itaparica, Ltd. v. Hargrove (In re Hargrove),* 164 B.R. 768, 772 (Bankr. N.D.Okla.1994). The court in *Evans v. Dunston (In re Dunston),* 117 B.R. 632 (Bankr. D.Colo.1990), *aff'd in part, rev'd in part,* 146 B.R. 269 (D.Colo.1992), further defined "false pretenses" as follows:

[A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor....

A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

117 B.R. at 641.

With respect to the reliance element, the Seventh Circuit has been less than clear. *See Kimzey,* 761 F.2d at 423–24 (required the creditor's reliance to be reasonable); *Mayer,* 51 F.3d at 675–76 (backed away from the reasonableness requirement, without specifically overruling *Kimzey,* and defined reliance as "the conjunction of a material misrepresentation with causation in fact"); *Sheridan,* 57 F.3d at 635 (quoted the *Mayer* definition of reliance). The Court will consider the evidence in light of the recently articulated "justifiable reliance" standard enunciated in *Field,* rather than the higher burden of "reasonable reliance" set forth in *Kimzey* or the "actual reliance in fact" standard espoused in *Mayer.* According to the majority opinion in *Field,* "justifiable reliance" is a lower burden to prove than "reasonable reliance" and "does not mean that [the objecting creditor's] conduct must conform to the standard of the reasonable man." — U.S. at —, 116 S.Ct. at 444.

## B. *The Willful and Malicious Claim Under Count III*

PSX further contends that the debt incurred is nondischargeable under § 523(a)(6). Section 523(a)(6) excepts from discharge any debt incurred by "willful and malicious injury," and provides in pertinent part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

■■■ In order for a debt to be held nondischargeable under § 523(a)(6), PSX has the burden of proving that the injury resulted from an act that was both willful and malicious. *Dornik v. Maurice (In re Maurice)*, 138 B.R. 890, 896 (Bankr.N.D.Ill.1992), *aff'd*, No. 92 C 4043, 1992 WL 308535 (N.D.Ill. Oct. 19, 1992), *aff'd*, 21 F.3d 767 (7th Cir.1994) (quoting *Kimzey*, 761 F.2d at 424); *United Bank of Southgate v. Nelson*, 35 B.R. 766, 768 (N.D.Ill.1983); *Taradash v. Pokorny (In re Pokorny)*, 143 B.R. 179, 182 (Bankr. N.D.Ill.1992); *Brill v. Dvorak (In re Dvorak)*, 118 B.R. 619, 627 (Bankr.N.D.Ill.1990); *Bristol Lumber Co. v. Hopkins (In re Hopkins)*, 82 B.R. 952, 953 (Bankr.N.D.Ill.1988). The term "willful" means deliberate or intentional, and "malicious" means wrongful and without just cause or excuse; it does not require ill will or specific intent to do harm. *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (collected citations omitted); *McCarthy v. McCarthy (In re McCarthy)*, 179 B.R. 876, 880 (Bankr.N.D.Ill.1995). Whether the Debtor acted willfully and maliciously is ultimately a question of fact. *Id.* The conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, is a willful and malicious injury with the meaning of § 523(a)(6). *Leigh*, 165 B.R. at 215.

■■■ Conversion under Illinois law constitutes an unauthorized act by which an owner is deprived of personal property, or an unauthorized exercise of ownership rights over personal property belonging to another so as to alter the owner's rights, or exercise of dominion over property inconsistent with rights of the owner, or unauthorized acts of dominion or ownership exercised by one person over personal property belonging to another. *See First State Bank of Alsip v. Iaquinta (In re Iaquinta)*, 98 B.R. 919, 925 (Bankr.N.D.Ill.1989) (citations omitted).

■■■ The plaintiff must show that the converted property is indeed its property. 12A *Illinois Law and Practice*, Conversion § 2 (1983 and 1995 Supp.). The failure to pay over money rightfully received does not constitute conversion unless the recipient of the money is duty bound to pay over the identical money received. *Langdon v. Alexander (In re Alexander)*, 19 B.R. 149, 151 (Bankr.D.Ore.1981). Once a check is delivered, the monies no longer belong to the maker of the check. *See Taylor v. Sanders (In re Sanders)*, 105 B.R. 111, 113 (Bankr. M.D.Fla.1989); *Maneval v. Davis (In re Davis)*, 155 B.R. 123, 131 (Bankr.E.D.Va. 1993); *Lisk v. Criswell (In re Criswell)*, 52 B.R. 184, 203 (Bankr.E.D.Va.1985).

## IV. DISCUSSION

### A. Count I

PSX alleges that the Debtor's representation concerning the availability of only one CAT scanner unit, and that he could obtain it and the other equipment from Shimadzu was fraudulent or constituted false pretenses. PSX maintains that the Debtor represented that USI could obtain equipment from Shimadzu at a time when he knew that USI could not obtain additional equipment. Further, PSX alleges that the Debtor induced PSX to place orders and make down payments so that USI could pay Shimadzu on other outstanding invoices, rather than on the equipment ordered by PSX.

■■■ The first element that PSX is required to prove under § 523(a)(2)(A) is that the Debtor obtained the funds from PSX through representations he either knew to be false, or made with such reckless disregard for the truth as to constitute willful misrepresentations. *Mayer*, 51 F.3d at 673. PSX proffered Plaintiff's Exhibit No. 16, a letter from Shunji Fukui, director of business man-

agement at Shimadzu to Mr. Y. Tahara, a general manager of Shimadzu in Japan, to show that Shimadzu did in fact have four CAT scanners in its possession. The Debtor countered, however, with testimony that when he spoke to a representative from Shimadzu, he was told that only one CAT scanner in the model requested by PSX (SCT–3000TX) was available, and thus he did not make any false representations to PSX. In addition, the Debtor testified that there are numerous different Shimadzu models of CAT scanners and that the letter (Plaintiff's Exhibit No. 16) does not specify model numbers for any CAT scanners referenced. It is undisputed that PSX ordered a SCT–3000TX model CAT scanner from USI. The Court finds that Plaintiff's Exhibit No. 16, standing alone, does not demonstrate by a preponderance of the evidence that the Debtor made a misrepresentation to PSX. Plaintiff's Exhibit No. 16 fails to reference any model number or type of CAT scanner. The Debtor's testimony that there were several models of Shimadzu CAT scanners was unrebutted.

■ The Court similarly finds that PSX has failed to demonstrate by a preponderance of the evidence that the Debtor procured the funds from PSX through representations he either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation. The evidence demonstrated that prior to PSX's remittance of its down payments to USI, a purchase order was placed by USI for, inter alia, a SCT–3000TX CAT scanner designated for delivery to PSX. *See* Defendant's Exhibit No. 2. In fact, as late as September 26, 1990, USI was revising the delivery destination on the PSX purchase orders placed with Shimadzu. *Id.* at p. 5. The evidence is undisputed that on September 17, 1990, when PSX sent to USI its first two down payments of $33,201.25 and $31,182.50, USI wire transferred $207,050.90 to Shimadzu to apply on its delinquent account. On September 18, 1990, when PSX sent its third down payment to USI of $89,605.00, USI in turn sent a $193,293.40 check that day to Shimadzu.

Using those funds from PSX's down payments, plus other funds from USI's bank account, to pay down the debt owed to Shi-

madzu is not per se indicative of the Debtor's alleged misrepresentation that he could get the equipment ordered when he knew he could not obtain it. Rather, same is more indicative of a substantial effort to pay Shimadzu as agreed, even if the proceeds from PSX's checks for the down payments were used to pay USI's debt to Shimadzu. Such payments to Shimadzu were made to induce it to continue to accept orders from USI and ship equipment for its customers, like PSX. There is no evidence that the Debtor personally pocketed or diverted PSX's down payments somewhere other than to Shimadzu. In fact, the same or next day remittances to Shimadzu, after receipt of PSX's down payments, is objective evidence of the Debtor's actions to try to obtain the ordered equipment when there was still time left in September to meet the balance due that month per the September 4 payment schedule. The Debtor's testimony was unrebutted that as shipments of equipment from Shimadzu slowed down, so did USI's collection of its accounts receivable from which it could pay its debt to Shimadzu. Accordingly, the Court finds that PSX failed to prove by a preponderance of the evidence that the Debtor made false representations or obtained the down payments by false pretenses. Hence, PSX failed to meet the first element under § 523(a)(2)(A).

■ The second element that PSX must demonstrate by a preponderance of the evidence is that the Debtor possessed the requisite scienter, i.e., he actually intended to deceive PSX. *Mayer*, 51 F.3d at 673. The Court finds that PSX failed to meet its burden on this element. The Debtor specifically denied that he intended to deceive PSX. More significantly, the Court is unable to infer from the totality of the evidence that the Debtor intended to deceive PSX when he took the equipment orders, which USI accepted, and subsequently used the PSX down payments to pay on the account owed Shimadzu. The mere fact that the Debtor requested the 20 percent down payment at the time PSX placed the order for the CAT scanner does not itself establish a fraudulent intent by the Debtor to deceive PSX. That USI was being strongly pressed by Shimadzu

in September 1990, to pay a total of over $590,000, likewise, does not persuade the Court that the Debtor then actually intended to defraud PSX out of its down payments. That the Debtor failed to disclose USI's problems with Shimadzu to PSX does not alter the result because neither the Debtor nor USI were agents for PSX. The retail agreement expressly provided that PSX and USI were independent contractors (Plaintiff's Exhibit No. 57, Article 5, Section 5.02) in the relationship of vendee and vendor. As such, the Debtor was not obligated or duty bound to apprise PSX of the state of affairs between USI and Shimadzu. There is no corroborative evidence to prove that the Debtor knew at the time he took the orders and the down payments, there was no way he could supply PSX with the subject equipment.

PSX concludes that in mid-September, the Debtor knew the CAT scanner and other equipment would never be delivered to PSX by October 30, 1990, because of USI's inability to remit scheduled payments to Shimadzu. The Debtor testified that he believed that USI could deliver the goods that PSX had ordered, but admitted that USI could not keep to the September 4 payment schedule. The Court finds that the Debtor's belief was objectively reasonable because Shimadzu had confirmed the orders in writing, dated September 12, 1990, even *before* PSX sent in its down payments to USI, which were subsequently remitted to Shimadzu. *See* Defendant's Exhibit No. 4, pp. 4–5. That USI was short in payment to Shimadzu by approximately $190,000 at the end of September does not prove that it would have been impossible under any circumstances for USI to meet the September 4 payment schedule, and that the Debtor certainly knew so at the time of the Debtor's earlier statements to PSX.

PSX further argues that Shimadzu's numerous warnings of threatened termination demonstrate that the Debtor knew or should have known that USI could not deliver the equipment. The Debtor, Bailey, and Nagy all testified, without rebuttal, that Shimadzu had been warning for years of a termination, but had never followed through on that threat prior to October 1, 1990. The evidence admitted at trial shows that at the time the orders were placed by PSX, the Debtor had a reasonable belief that Shimadzu would ship the equipment ordered by PSX. Earlier in September 1989, Shimadzu had warned USI that until it saw an "improvement" in USI's payments, Shimadzu would "control [its] shipments" to USI. *See* Plaintiff's Exhibit No. 1. The Debtor testified, however, that the accounts payable to Shimadzu continued to increase and yet, until the Hillcrest Hospital shipment in September 1990, Shimadzu put no controls on USI's shipments. Additionally, on March 23, 1990, Shimadzu demanded that the Debtor and Bailey personally guaranty USI's debt to Shimadzu. Shimadzu also required that any order be accompanied by a payment for the entire purchase plus 10 percent. *See* Plaintiff's Exhibit No. 6. The evidence demonstrated, however, that the Debtor only guaranteed payment on the specific MRI machine for Hillcrest; Bailey never gave Shimadzu a personal guaranty; and the other payment requirements by Shimadzu were never implemented. Finally, even though Shimadzu, through its counsel, sent a letter to USI on August 14, 1990 (Plaintiff's Exhibit No. 9), imposing numerous conditions and demands on USI, the Debtor, and Bailey for the continuation of their business, the Debtor's unrebutted testimony was that although these conditions were not met, Shimadzu continued to ship goods in September. *See also* Defendant's Exhibit No. 5.

█ Moreover, by the time the Debtor allegedly knew or should have known that Shimadzu would terminate USI as a wholesaler, USI had paid Shimadzu nearly $1,000,000 in August and September. *See* Defendant's Exhibit Nos. 3A and 3B. The Court finds that these actions are not evidence of intentional deceit of PSX by the Debtor. Rather, the payments are evidence of an attempt to placate Shimadzu's demands for payment on USI's accounts payable owed. The Debtor's failure to perform his subsequent statement to Mark Schaefer, a principal of PSX, that he would either get the equipment or refund PSX's down payment, may be a breach of contract, but is not *ipso facto* tantamount to fraud.

Pursuant to the final element, PSX must show that it justifiably relied on the misrepresentations, to its detriment. *Field*, — U.S. at ——, 116 S.Ct. at 444 (a person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation"). *Contrast Mayer*, 51 F.3d at 673; *Kimzey*, 761 F.2d at 423–24. The Court finds that PSX proved this element. The unrebutted testimony of Marc Schaefer was that he did in fact actually rely on the Debtor's statement regarding the availability of only one CAT scanner and that the equipment for the dual room installation could be obtained from Shimadzu by October 30, 1990. Given the prior satisfactory relations between PSX and USI since 1988, coupled with the lack of any advance knowledge of Shimadzu's demands on USI in September 1990, or USI's disputes with Shimadzu and the strained relations between them, PSX's reliance on the Debtor's statements was both actual in fact and justifiable.

In conclusion, the Court finds that PSX failed to prove all of the requisite elements under § 523(a)(2)(A). Consequently, the Court finds that the debt is dischargeable under this section.

### B. *Count III*

PSX alleges that the Debtor willfully and maliciously converted its property by depositing the down payments PSX made for equipment into the USI checking account and then failing to refund the money. PSX maintains that the Debtor induced PSX to place orders and make down payments knowing that Shimadzu would not fill the orders because of the degree of USI's overdue accounts. Moreover, PSX alleges that the Debtor knew that USI would use the PSX down payments to pay Shimadzu on outstanding invoices rather than on the equipment ordered by PSX. The Court holds that the Debtor's actions, though willful because intentional, were not malicious or without just cause or excuse for purposes of § 523(a)(6), and thus, PSX has failed to prove that the Debtor converted its property.

In order to establish a conversion of property, PSX must show that the down payments, in the hands of USI, were indeed its property. PSX has failed to demonstrate any retained property interest in the subject down payments. Under the instant facts, it is clear that once PSX paid the down payments to USI without any "earmarking" or restriction of use, they were no longer its property and could not be the subject of a conversion. *See, e.g., Kiernan v. Lambillotte (In re Lambillotte)*, 17 B.R. 256, 258 (Bankr. M.D.Fla.1982) (homeowners failed to establish that down payment given to builder was their property); *Criswell*, 52 B.R. at 203 (same). Nothing in the contract between PSX and USI required the down payments to be segregated and utilized only for the purchase of the subject equipment for PSX. *See* Plaintiff's Exhibit No. 57. The Debtor testified that upon receipt of the PSX down payments, said monies were deposited into USI's general corporate bank account in accordance with USI's usual and regular business practices. This was the common practice with all down payments from all customers of USI.

Mark Schaefer testified that on October 2 or 3, 1990, several weeks after submitting the down payments, he requested that those funds be sequestered and utilized only for the purchase of the equipment ordered by PSX. The Court finds that Mark Schaefer's request to the Debtor was after the fact of placing the orders, remittance, deposit of the down payments, and the forwarding of the payments to Shimadzu. Hence, the Court holds that PSX failed to prove by a preponderance of the evidence that the Debtor maliciously converted its property. Thus, the Court hereby finds in favor of the Debtor under Count III of the complaint.

### V. *CONCLUSION*

For the foregoing reasons, the Court hereby enters judgment in favor of the Debtor on Counts I and III of the complaint and holds that the debt owed to PSX by the Debtor is dischargeable under §§ 523(a)(2)(A) and (a)(6). The Debtor's oral motion for directed findings under Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil

Procedure 52(c) made at the close of PSX's case in chief, on which the Court reserved ruling, is hereby granted.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.